UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

JOHNNY TRUESDALE,

          Petitioner,

vs.                              Case No.  2:08-cv-927-FtM-99DNF

SECRETARY,  DOC.,  FLORIDA  ATTORNEY
GENERAL,

          Respondents.
_____

### OPINION AND ORDER

#### I. Status

Petitioner  Johnny  Truesdale  (hereinafter  "Petitioner"  or
"Truesdale") initiated this action by filing a *pro se* Petition for
Writ of Habeas Corpus ("Petition," Doc. #1) pursuant to 28 U.S.C.
§ 2254 on November 26, 2008.[1] The Petition challenges Petitioner's
March 26, 2002, judgment of conviction for two counts of robbery,
which was entered in the Twentieth Judicial Circuit Court, Lee
County, Florida (case number 01-1465-CF). Petitioner was sentenced
to consecutive prison terms of 15 years on count one and 5 years on

---

[1]The Petition was filed in this Court on December 8, 2008;
however, the Court applies the "mailbox rule" and deems a petition
"filed on the date it is delivered to prison authorities for
mailing." *Williams v. McNeil*, 557 F.3d 1287, 1290 n.2 (11th Cir.
2009).

count two. Petition at 1.[2] The Petition raises the following grounds for relief:

Ground 1: State knowingly withheld exculpatory nature of evidence and knowingly used materially false and misleading testimony to gain.

Ground 2: (A) Trial court erred in allowing testimony of uncharged crimes; and, (B) counsel fundamentally erred by failing to object to its admission.

Ground 3: Counsel was ineffective for failing to investigate and discover exculpatory nature of information contained in BOLO.

Ground 4: Counsel failed to call alibi witnesses.

Petition at 5-9. Respondent filed a Response to the Petition and addressed each of the grounds raised for relief (Doc. #9, Response). Respondent moves for summary judgment based upon Petitioner's procedural defaults and/or failure to satisfy his burden under 28 U.S.C. § 2254(d), (e). Respondent filed exhibits (Exhs. A-G) in support of his Response, including the record on direct appeal (Exh. B). Petitioner filed a reply to the Response (Doc. #11, Reply). Consequently, this matter is ripe for review.

---

[2]The page numbers referenced within this Order, other than to the page number referenced in the Exhibits, are to the page of the identified document as it appears on the Court's case management electronic computer filing system. Exhibits are available in paper format only.

-2-

### III. Applicable § 2254 Law

Truesdale filed his timely[3] Petition after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996). Consequently, post-AEDPA law governs this action. *Abdul-Kabir v. Quarterman*, 127 S. Ct. 1654, 1664 (2007); *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Davis v. Jones*, 506 F.3d 1325, 1331, n.9 (11th Cir. 2007). Under AEDPA, the standard of review is "greatly circumscribed and is highly deferential to the state courts." *Stewart v. Sec'y Dep't of Corr.*, 476 F.3d 1193, 1208 (11th Cir. 2007)(quoting *Crawford v. Head*, 311 F.3d 1288, 1295 (11th Cir. 2002). *See also Parker v. Sec'y Dep't of Corr.*, 331 F.3d 764 (11th Cir. 2003). AEDPA altered the federal court's role in reviewing state prisoner applications in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

### A. Federal Question

A federal court may only entertain an application for a writ of habeas corpus from a state prisoner who claims his custody violates the "Constitution or the laws or treaties of the United

---

[3]Respondent concedes that, due to Petitioner's post-conviction filings, the Petition is timely filed within the one-year federal limitations period set forth in 28 U.S.C. Section 2244(d). Response at 6, ¶14. The Court agrees.

States." 28 U.S.C. § 2254(a). Questions of state law are generally insufficient to warrant review or relief by a federal court under § 2254. *Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *Carrizales v. Wainwright*, 699 F.2d 1053, 1055 (11th Cir. 1983); *Cabberiza v. Moore*, 217 F.3d 1329, 1333 (11th Cir. 2000). A violation of a state rule of procedure, or of state law itself, is not a violation of the federal constitution. *Wallace v. Turner*, 695 F.2d 545, 548 (11th Cir. 1982); *Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1989). "It is a fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters." *Herring v. Sec'y. Dep't of Corr.*, 397 F.3d 1338, 1355 (11th Cir. 2005)(internal quotations and citations omitted).

## B. Exhaustion and Procedural Default

A federal court may only review an issue under § 2254 if petitioner first afforded the state courts an adequate opportunity to address that issue. 28 U.S.C. § 2254(b)(1)(A).

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights. To provide the State with the necessary opportunity, the prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim.

*Baldwin v. Reese*, 541 U.S. 27, 29 (2004)(internal citations and quotations omitted.) This imposes a "total exhaustion" requirement

-4-

in which all the federal issues must have first been presented to the state courts. *Rhines v. Weber*, 544 U.S. 269, 274 (2005). "In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). *See also Henderson v. Campbell*, 353 F.3d 880, 891 (11th Cir. 2003) ("A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts.")(quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)); *Duncan v. Henry*, 513 U.S. 364, 365 (1995)(stating "exhaustion of state remedies requires that petitioners 'fairly present federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights'").

"A claim is procedurally defaulted if it has not been exhausted in state court and would now be barred under state procedural rules." *Mize v. Hall*, 532 F.3d 1184, 1190 (11th Cir. 2008). Under the procedural default doctrine, "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, . . . . ." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A procedural default for failing to exhaust state court remedies will only be excused in two narrow circumstances. First,

a petitioner may obtain federal habeas review of a procedurally defaulted claim if he shows both "cause" for the default and actual "prejudice" resulting from the asserted error. *House v. Bell*, 547 U.S. 518, 536-37 (2006); *Mize v. Hall*, 532 F.3d at 1190. Second, under exceptional circumstances, a petitioner may obtain federal habeas review of a procedurally defaulted claim, even without a showing of cause and prejudice, if such review is necessary to correct a fundamental miscarriage of justice. *House v. Bell*, 547 U.S. 518, 536 (2006); *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).

## C. Deference to State Court Decision

Even where a petitioner's claim raises a federal question, was exhausted, is not procedurally barred, and was adjudicated on the merits in the state courts, habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). *Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1398 (2011). "This is a difficult to meet, and highly deferential standard for evaluating state-court rulings, which demands that the state-court decisions be given the benefit of the

-6-

doubt." *Id.* (internal quotations and citations omitted). A state court's summary rejection of a claim, even without explanation, qualifies as an adjudication on the merits which warrants deference. *Ferguson v. Culliver*, 527 F.3d 1144, 1146 (11th Cir. 2008). Recently, the Supreme Court held that review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen,* 131 S. Ct. at 1398. Thus, the Court is limited to reviewing only the record that was before the state court at the time it rendered its order. *Id.*

"Clearly established federal law" consists of the governing legal principles, rather than the *dicta*, set forth in the decisions of the United States Supreme Court at the time the state court issues its decision. *Carey v. Musladin*, 549 U.S. 70, 74 (2006)(citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). "[T]o be 'contrary to' clearly established federal law, the state court must either (1) apply a rule that contradicts the governing law set forth by Supreme Court case law, or (2) reach a different result from the Supreme Court when faced with materially indistinguishable facts." *Ward*, 591 F.3d at 1155 (internal quotations and citation omitted); *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003). A state court decision involves an "unreasonable application" of the Supreme Court's precedents if the state court correctly identifies the governing legal principle but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown*, 544 U.S. at 134; *Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir. 2000),

*cert. denied*, 534 U.S. 956 (2001); or, "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Bottoson*, 234 F.3d at 531 (quoting *Williams*, 120 S. Ct. at 1520). The "unreasonable application" inquiry "requires the state court decision to be more than incorrect or erroneous"; it must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75-77 (2003) (citation omitted); *Mitchell*, 540 U.S. at 17-18; *Ward*, 592 F.3d at 1155.

### D. Ineffective Assistance of Counsel

Ineffective assistance of counsel claims are reviewed under the standards established by 28 U.S.C. § 2254(d). *Newland v. Hall*, 527 F.3d 1162, 1183 (11th Cir. 2008). Post-AEDPA, the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), remains applicable to the claims of ineffective assistance of counsel raised in this case. *Newland*, 527 F.3d at 1184. In *Strickland*, the Supreme Court established a two-part test to determine whether a convicted person is entitled to habeas relief on the grounds that his or her counsel rendered ineffective assistance: (1) whether counsel's representation was deficient, *i.e.*, "fell below an objective standard of reasonableness" "under prevailing professional norms," which requires a showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (2) whether

the deficient performance prejudiced the defendant, *i.e.*, there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 688; *see also Bobby Van Hook*, 558 U.S. ___, 130 S. Ct. 13, 16 (2009). Thus, a habeas court's review of a claim under the *Strickland* standard is "doubly deferential." *Knowles v. Mirzayanze*, ___ U.S. ___, 129 S. Ct. 1411, 1420 (2009)(citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, at 694. That requires a "substantial," not just "conceivable," likelihood of a different result. *Harrington v. Richter*, 562 U.S. ___, 131 S. Ct. 770, 791 (2011).

States may "impose whatever specific rules . . . to ensure that criminal defendants are well represented," but "the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Bobby Van Hook*, 130 S. Ct. at 17 (internal quotations and citations omitted). It is petitioner who bears the heavy burden to "prove, by a preponderance of the evidence, that counsel's performance was unreasonable." *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006), *cert. denied sub nom. Jones v. Allen*, 127 S. Ct. 619 (2006). A court must "judge the reasonableness of counsel's conduct on the facts of the

-9-

particular case, viewed as of the time of counsel's conduct," *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (quoting *Strickland*, 466 U.S. at 690), applying a "highly deferential" level of judicial scrutiny. *Id.* A court must adhere to a strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. An attorney is not ineffective for failing to raise or preserve a meritless issue. *Ladd v. Jones*, 864 F.2d 108, 109-10 (11th Cir.), *cert. denied sub nom. Ladd v. Burton*, 493 U.S. 842 (1989); *United States v. Winfield*, 960 F.2d 970, 974 (11th Cir. 1992) ("a lawyer's failure to preserve a meritless issue plainly cannot prejudice a client"). "To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000)(quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).

"In considering the reasonableness of an attorney's decision not to raise a particular claim, [a court] must consider 'all the circumstances, applying a heavy measure of deference to counsel's judgments.'" *Eagle*, 279 F.3d 926, 940 (11th Cir. 2001) (quoting *Strickland*, 466 U.S. at 691). "Thus, '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight to reconstruct the

circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at that time.'" *Id.* (quoting *Strickland*, 466 U.S. at 689). The reasonableness of counsel's assistance is reviewed in light of both the facts and law that existed at the time of the challenged conduct. *Chateloin v. Singletary*, 89 F.3d 749, 753 (11th Cir. 1996).

IV. **Findings of Fact and Conclusions of Law**

This Court has carefully reviewed the record and, for the reasons set forth below, concludes no evidentiary proceedings are required in this Court. *Schriro v. Landrigan*, 550 U.S. 465, 474-475 (2007). Petitioner does not proffer any evidence that would require an evidentiary hearing, *Chandler v. McDonough*, 471 F.3d 1360 (11th Cir. 2006), and the Court finds that the pertinent facts of the case are fully developed in the record before the Court. *Schriro*, 550 U.S. at 475.

**Grounds 1 and 3**

Because Grounds 1 and 3 are related, the Court will address them together. In Ground 1, Petitioner contends that the State, in violation of *Brady*[4] and *Giglio*,[5] knowingly withheld exculpatory evidence and knowingly used materially false and misleading

---

[4]*Brady v. Maryland*, 373 U.S. 83 (1963). *Brady* requires the State to disclose material exculpatory evidence in its possession.

[5]*Giglio v. United States*, 405 U.S. 150 (1972). *Giglio* holds that the presentation of known false evidence constitutes a due process violation.

testimony at trial. Petition at 5. In particular, Petitioner claims that the tag number on the computer printout of the BOLO (Be On the Look Out) did not correspond to the tag number of vehicle that Petitioner was accused of driving during the robbery. *Id.* at 19. Further, Petitioner argues that, when the prosecutor disclosed the BOLO to the court and defense counsel on the second day of trial, she stated that she would not be using the BOLO as evidence because it contained the "same" evidence that had been testified to by the witnesses the prior day. *Id.* at 17. Petitioner claims that the prosecutor misled the court because, contrary to the prosecutor's statement, the testimony offered by the witnesses was not the same as the information contained on the BOLO print-out. *Id.*

In Ground 3, Petitioner claims counsel was ineffective for failing to investigate and discover the exculpatory nature of the information contained in the BOLO printout. *Id.* at 8. Petitioner argues that, had counsel investigated the BOLO print-out, he would have discovered that the tag number did not match the tag number of the vehicle Petitioner was claimed to have driven and could have moved for a mistrial. *Id.* at 30.

The Court finds Grounds 1 and 3 are procedurally barred. The record shows that Petitioner filed a second Rule 3.850 motion on May 18, 2007, contending that these two claims were not time-barred by Florida's two-year limitation rule because these two claims were based upon newly discovered evidence. Exh. F-1. In its January 8,

-12-

2008 order, the postconviction court denied that the information contained in the BOLO constituted newly discovered evidence and denied Petitioner's second Rule 3.850 motion as barred by Florida's two-year limitation rule. Exh. F-3. In pertinent part, the postconviction court found as follows:

2. This is Defendant's second 3.850 motion, which would be untimely except for the fact that Defendant is alleging that his allegation is based on newly discovered evidence. Defendant claims that on March 13, 2007, he acquired inadvertently through institutional mail evidence of a BOLO printout, which was included in a response from the Lee County Clerk of Court concerning a pending 3.800(a) motion. Defendant further alleges that the fact that the last three numbers of the tag[] on the truck described in the BOLO did not match the tag[] from the truck Defendant was accused of driving, is evidence that the State tried to perpetrate a fraud on the Court. However, Defendant also admits that this same BOLO was produced by the State as discovery during the trial. (Citations omitted).

3. Furthermore, the record shows that both the defense attorney and the Court were aware of the BOLO at that time. In fact, a *Richardson* Hearing was conducted and the Court found the discovery violation not to be prejudicial, because the State was not introducing the BOLO into evidence. (Citations omitted).

4. Case law provides that newly discovered evidence is evidence that existed at the time of trial but was unknown by the trial court, the party, or defense counsel at the time, and it must appear that neither defendant nor defense counsel could have known of the evidence by the exercise of due diligence. *Moss v. State*, 860 So. 2d 1007, 1009 (Fla. 5th DCA 2003). Based on this definition, the BOLO is not newly discovered evidence because counsel became aware of the BOLO during trial.

5. Furthermore, in order for the State to be guilty of a *Brady* violation, a defendant must establish that: the State possessed evidence that was favorable to the defendant; the defendant did not or could not have

-13-

> obtained the evidence himself with reasonable diligence;
> the prosecution suppressed the favorable evidence; and
> had the evidence been disclosed, there was a reasonable
> probability that the outcome of the proceeding would have
> been different.  *Id*.

> 6.   In addition, the BOLO, which is the issue in this
> motion, was discussed in a previous Order rendered by
> this Court on December 6, 2004. (Citation omitted).

> 7.   Defendant also raises a second allegation.
> Defendant alleges that trial counsel was ineffective for
> failing to discover and investigate the exculpatory
> nature of the BOLO.  However, because the BOLO is not
> newly discovered evidence, this allegation is also barred
> by the rule's two year time limitation.

*Id*. at 1-2.  Petitioner appealed the denial of his second Rule

3.850 motion, and the appellate court *per curiam* affirmed. Exh. G-

2.

Petitioner insists that his discovery of the BOLO constitutes

newly discovered evidence.  In order for evidence to be considered

newly discovered, it must pass a two-prong test set forth by the

Florida Supreme Court.  First, the evidence "must have been unknown

by the trial court, by the party, or by counsel at the time of

trial, and it must appear that the defendant or his counsel could

not have known [of it] by the use of diligence."  *Jones v. State*,

709 So.2d 512 (Fla. 1998)(quoting *Torres-Arboleda v. Dugger*, 636

So.2d 1321, 1324-25 (Fla. 1994)).  Secondly, the newly discovered

evidence must be of such a nature that it would probably produce an

acquittal on retrial. *Jones v. State*, 591 So.2d 911 (Fla. 1992).

Here, the postconviction court not only found Petitioner's

second Rule 3.850 motion untimely, it also found that Petitioner

-14-

was not entitled to the exception of the two-year limitation period because the BOLO did not qualify as newly discovered evidence to pass the *Jones* test. As noted, the postconviction court's decision was affirmed on appeal. A factual finding by a state court is presumed to be correct and a petitioner must rebut this "presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005); *Hunter v. Sec'y, Dep't of Corr.*, 395 F.3d 1196, 1200 (11th Cir. 2005).

Petitioner does not come forward with clear and convincing evidence to rebut the State court's findings. Indeed, review of the record reveals that the BOLO was introduced during trial and the Court held a *Richardson* hearing concerning the late discovery violation. See, Exh. A-3 (trial transcript) at 103-110. Thus, Grounds 1 and 3 are procedurally defaulted and Petitioner does not show cause and prejudice or a fundamental miscarriage of justice to overcome the procedural default. Therefore, the Court is bound to apply the State's procedural bar to Grounds 1 and 3 and will not reach the merits of these two claims.

**Grounds 2(A) and 2(B)**

In Ground 2(A), Petitioner claims that the trial court erred in allowing testimony of other uncharged crimes to come into evidence. Petition at 6. In particular, Petitioner states that the jury heard testimony about "other similar crimes . . . involving Blacks against Hispanic victims." *Id.* at 36. Respondent

-15-

concedes that Petitioner exhausted this issue by raising it on direct appeal. Response at 6, ¶15. *See also* Exh. B-1.

In Ground 2(B), Petitioner assigns error to trial counsel for counsel's failure to object to this testimony. *Id.* Respondent argues that Petitioner improperly raised this issue on direct appeal, but failed to raise the issue of counsel's ineffectiveness in failing to object to the prejudicial testimony at trial in a proper Rule 3.850 motion. Response at 6, ¶15. Consequently, Respondent submits that Ground 2(B) is unexhausted, or in the alternative, fails to constitute fundamental error if deemed raised on direct appeal. *Id.*

A review of the record reveals that on direct appeal, Petitioner advanced one issue:

The admission of prejudicial and irrelevant evidence about the numbers of Hispanic robberies and the characterization of the area as a high crime area denied [Truesdale] a fair trial.

Exh. B-1 at 11. In response, the State argued that this evidentiary issue was "not preserved and therefore may not be considered on this appeal." Exh. B-2 at 6. The State pointed out that defense counsel only made one objection to the now objected to testimony, and defense counsel's sole objection was sustained by the trial court. *Id.* Further, the State argued that defense counsel opened the door to the line of questioning by asking one of the victims during cross-examination about a response he gave to a question on direct concerning the robberies in the area. *Id.*

-16-

Alternatively, the State contended, that even if the appellate court deemed the ground properly raised on direct appeal, the State maintained that Truesdale failed to establish that the challenged testimony constituted a fundamental error. *Id.* In reply to the State's response on direct appeal, Truesdale argues that "[t]he fact that the testimony was not objected [to] further underscore[s] the probability that trial counsel was ineffective as there would be no strategic or tactical advantage to be gained by the admission of this testimony." Exh. B-3 at 2. Truesdale further stressed that "[t]he sheer volume of improper and prejudicial testimony buttresses . . . that the error was not harmless and that the error was fundamental . . . ." *Id.* The appellate court *per curiam* affirmed. Exh. B-4.

At the outset, the Court finds that Petitioner's claim that counsel was ineffective as raised in Ground 2(B) is unexhausted and procedurally barred. It is undisputed that Petitioner did not file a Rule 3.850 motion concerning counsel's alleged ineffectiveness for failing to object to the complained of testimony. *See* Exhs. D-1 and F-1. Nor, did Truesdale raise a claim that counsel was ineffective in his brief on direct appeal. Exh. B-1. Instead, Truesdale made only a passing reference to counsel's ineffectiveness in his reply to the State's answer on direct appeal. Exh. B-3 at 2. Indeed, Truesdale neither identifies the federal standard nor includes federal case law in support of a claim that counsel was ineffective. At most, Petitioner's passing

-17-

reference to counsel's ineffectiveness in his reply is akin to the "needles in the haystack" that the Eleventh Circuit expressly found to be insufficient to exhaust a federal issue in *McNair v. Campbell*, 416 F.3d 1291, 1301 (11th Cir. 2005). Thus, the Court denies Petitioner relief on Ground 2(A) because it is unexhausted and procedurally defaulted. Petitioner does not show cause and prejudice or a fundamental miscarriage of justice to overcome this default.

In the alternative, the Court finds that Petitioner's claim that the trial court erred in allowing testimony of other uncharged crimes to come into evidence, as raised in Ground 2(A) and to the extent deemed exhausted as raised on direct appeal, is without merit. In Florida, "except in cases of fundamental error, an appellate court will not consider an issue unless it was presented to the lower court." *Steinhorst v. State*, 412 So. 2d 338 (Fla. 1982); *Archer v. State*, 613 So. 2d 446, 448 (Fla. 1993). The record confirms that trial counsel did not raise any objection to questions posed by the prosecution concerning the high incidence of robberies of Hispanics in the area.

On direct examination, the victim Jaime Garcia was the first witness to mention that a number of Hispanics in the area had been robbed. Specifically, Mr. Garcia, in response to how he felt about being robbed, stated:

> I was feeling bad. I was upset because, you know, they go there to do their thing and I'd rather not hold the money from giving it to them because I've heard other stories that have happened to friends of mine.

Exh. A-3 at 15. Defense counsel did not object to this testimony, but instead further inquired of the victim about this statement during cross-examination. In particular, the following exchange took place between defense counsel and the victim:

Q: Okay. Sir, you stated on direct that you had heard of the stories that happened to friends of yours?

A: Exactly.

Q: And were those stories of robberies?

A: Yes.

Q: Okay. You also stated on direct that, and I quote, "When they get here, something happens."

A: They killed a friend of mine like five or six years ago because he refused to give them $5.

Q: Sir, who is they?

A: It's a friend of mine who died. They killed him in East Fort Myers.

Q: Sir, when I say who is they, I want to know who you refer to as they when you say, "when they get there, something happens." Who is they?

A: I've been through that with my family and my friends. That's why I said that to the detective.

Q: Who is they, sir?

A: The black people. They are the ones that steal in the area.

*Id.* at 34-35. Thus, Petitioner brought this prejudicial evidence into the case and cannot now claim a violation of his constitutional rights by his own actions.

The second witness who testified concerning robberies in the area was the responding officer to the robbery, Detective Smith.

Detective Smith testified that he had "responded numerous times to robberies" in the area where the La Mexicana Restaurant is located; that Hispanic victims were commonly referred to as "walking ATMs" because "a lot of them are illegal so they'll get paid on Fridays, cash their money, have it in unknown locations, and they'll get robbed and then won't report it because they are illegal." *Id*. at 83-84. Again, defense counsel did not raise any objection to the questioning of Detective Smith.

Anna Roque, the owner of La Mexicana Grocery, was the third witness to give testimony concerning other robberies of Hispanics in the area. She testified that her store cashed paychecks for customers, that Friday was the "biggest check cashing day" of the week, and that there had been "at least five" other robberies in the area of the store's parking lot, and the victims of robberies "were all Mexicans." *Id*. at 210-215. Defense counsel objected only to the question as to whether the store cashes more checks on one day of the week, as opposed to other days. *Id*. at 214. The Court overruled the objection. *Id*.

During the testimony of Detective Ciresi, the following exchange occurred:

Q: All right. Now, with your training and your experience in the robbery division as a detective are you familiar with the ins and outs of what goes on as far as crime patterns go in Lee County?

A: Yes, ma'am.

Q: Do you all keep statistics on that kind of thing?

A: Yes, ma'am, we do. I don't have the exact statistics. If you're referring to Hispanic robberies, when I was in the unit, we had a large number of Hispanic robberies where -

MR. ARCHIBALD: I'm going to object, Your Honor. There's been no question stated as to whether Hispanic robberies occur or don't occur.

THE COURT: Sustained. Nonresponsive.

MS. STEWART: That will be my next question, though.
Q: Are there some patterns in different areas of town where one ethnic group might be victimized by another ethnic group?

A: Yes, ma'am.

Q: Okay. Are you familiar with the area of La Mexicana Restaurant on Ortiz Avenue?

A: Yes, ma'am.

Q: Now, at the time period that I'm talking about back in March of 2001 was that general area viewed by the Lee County Sheriff's Office as a high crime area?

A: Yes, ma'am.

Q: Okay. And were there certain crimes where one ethnic group would be targeted as victims?

A: Yes, ma'am, the Hispanic population is targeted in that area.

Q: Okay. Now, is there any statistic about the perpetrators of the crimes against the Hispanic people?

MR. ARCHIBALD: Your Honor, I'm going to have to object.

THE COURT: Sustained.

Q: Can you tell me are there any patterns about Hispanic -

THE COURT: Could you all approach?

(A bench conference was held outside the hearing of the jury.)

THE COURT: For the life of me I can't see how this is at all relevant to this case, what patterns there might be to crimes in Lee County.

MS. STEWART: Well, Your Honor -

THE COURT: You mean if there's a stickup in Cape Coral, somehow you're going to go into the ethnic patterns in Cape Coral?

MS. STEWART: Your Honor, we're talking about Ortiz and La Mexicana Restaurant.

THE COURT: So.

MS. STEWART: Your Honor, there are patterns of

THE COURT: What about Captiva? Are we going to go into the ethnology of Captiva?

MS. STEWART: That's not relevant.

THE COURT: Indeed, it's not.

MS. STEWART: Because this is where it happened.

THE COURT: If you've got a robbery at a grocery store in Captiva, would you want to bring in the ethnology of the Island of Captiva? Would you do that?

MS. STEWART: No.

THE COURT: So why is it relevant here?

MS. STEWART: Your Honor, in the last case that we had -

THE COURT: This is the first time I've heard an objection.

MR. ARCHIBALD: Well, Judge, I make them.

THE COURT: Not on this point.

MS. STEWART: Your Honor, that was brought in over my objection.

-22-

THE COURT: Well, it's not going to go on anymore. Let's get down to the facts.

MS. STEWART: Why is it not relevant?

THE COURT: Because I'm saying so. It's my job.

MS. STEWART: I'm just trying to understand your ruling. I'm sorry, Your Honor.

THE COURT: It's not relevant. If it's not relevant on Captiva, it's not relevant on Ortiz. It's not relevant. Thank you.

(The bench conference was concluded.)

*Id.* at 251-255. Thus, at the point that trial counsel objected to the alleged prejudicial testimony, the trial court sustained the objection and any further questioning on this subject stopped.

However, trial counsel either invited the damaging testimony, or failed to object to the alleged prejudicial testimony prior to this point. Consequently, the alleged prejudicial testimony proffered by Detective Smith and Anna Roque was not preserved for appellate review. This preservation requirement is consistently and regularly applied by the Florida courts. Consequently, as argued by the State on direct appeal, because trial counsel failed to assert any objection to the challenged testimony, the issue was not properly preserved for appellate review. Thus, the *per curiam* affirmance in Petitioner's direct appeal rests on an independent and adequate state grounds procedurally barring federal review of Ground 2(A). Petitioner does not make the required showing to excuse his procedural default.

In the alternative, even assuming *arguendo* that the testimony was impermissible, the Court finds no fundamental error to warrant habeas relief. State evidentiary rulings are reviewed in a habeas action only to determine "whether the error, if any, was of such magnitude as to deny petitioner his right to a fair trial." *Futch v. Dugger*, 874 F.2d 1483, 1487 (11th Cir. 1989)(internal quotations and citations omitted). "The standard in determining whether the admission of prejudicial evidence constitutes a denial of fundamental fairness is whether the evidence is material in the sense of a crucial, critical, highly significant factor." *Leverett v. Spears*, 877 F.2d 921, 925 (11th Cir. 1989)(internal quotations and citations omitted). Consequently, if other evidence of the defendant's guilt is overwhelming, then the defendant is not deprived of a fair trial, despite the introduction of the inadmissible evidence. *Thigpen v. Thigpen*, 926 F.2d 1003, 1012 (11th Cir. 1991).

Given the overwhelming evidence of Truesdale's guilt, which included the victim's identification of Petitioner as the robber with the gun, another victim's identification of the truck used and driven by the perpetrator during the robber, testimony by the owner of the truck[6] that he had lent the truck to Truesdale the night of the robbery, testimony by Truesdale's acquaintance that Truesdale

_____

[6]Because the owner of the truck was a white man and the victims and witnesses to the robbery all described the perpetrators as black men, the owner of the truck was eliminated as a suspect in the robbery.

-24-

was driving the truck the next morning at a high rate of speed followed by the police, ditched the truck and keys at her home, and told her the truck was "hot" from something that had "gone down" the night before, it is highly unlikely that testimony concerning crimes concerning Hispanics in the area contributed to the guilty verdict.

Based upon the foregoing, the Court finds that Petitioner has failed to show that the Florida court's decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or an unreasonable determination of the facts in light of the evidence presented. Consequently, the Court denies Petitioner relief on Ground 2(A).

### Ground 4

In his final ground for relief, Petitioner faults trial counsel for his failure to call alibi witnesses. Petition at 9. In support, Petitioner claims that trial counsel could have called several witnesses who would have provided an alibi for him but counsel failed to conduct an investigation. *Id.* at 48-49. Namely, Petitioner states that either his mother or his sisters would have testified that he "was with family members out of the county in Ocala, Florida at a reunion" on the day of the crime. *Id.* at 49. Petitioner also submits that counsel failed to call "two key witnesses (Tangie and Kayandra) who would have given testimony that

Petitioner did not possess the state witness Steve Marchand['s] truck on the day of the crime." *Id.* at 50.

Petitioner claims he raised Ground 4 in his Rule 3.850 motion, received an evidentiary hearing on the claim, and appealed the denial of his Rule 3.850 motion. Petition at 10. As pointed out by Respondent, Ground 4 as currently stated is not fully exhausted. Instead, Ground 4 is only deemed exhausted to the extent that Petitioner raised the claim below to the State post-conviction court and then appealed the denial therefrom to the appellate court. Upon review of Petitioner's Rule 3.850 motion, Petitioner faulted trial counsel only for his failure to call Lavette Truesdale as an alibi witness as his second ground for relief. Exh. D-1 at 000121. Further, the transcript of the evidentiary hearing reveals that Petitioner only advanced two claims: (1) counsel was ineffective for misadvising Petitioner regarding his right to testify; and, (2) that defense counsel was ineffective for failing to call an alibi witness that Petitioner had requested counsel to call. Exh. D-6 at 4. Consequently, to the extent that Petitioner seeks to expand Ground 4 to include other witnesses or allegations, these newly raised claims are unexhausted and now procedurally barred. Petitioner fails to show adequate cause and actual prejudice to excuse his default. Petitioner does not demonstrate that he is entitled to the fundamental miscarriage of justice exception. Thus, the Court will limit its review of Ground

4 to whether trial counsel was ineffective for failing to call
Lavette Truesdale as an alibi witness at trial.

As noted, Petitioner was afforded an evidentiary hearing in
connection with this ground for relief. Exh. D-4 at 000302, ¶4.
Petitioner, who was represented by counsel at the hearing,
testified on his own behalf. Also testifying was Petitioner's
sister, Lavette Truesdale, and trial counsel Michael Archibald.
Exh. D-6 (transcript from April 7, 2005 evidentiary hearing). By
order dated April 15, 2005, the postconviction court denied
Petitioner relief on Ground 4 (raised as ground two in Petitioner's
rule 3.850 motion). Exh. D-7. In pertinent part, the court held:

> 4. The benchmark for judging claims of ineffectiveness
> of counsel is whether counsel's performance undermined
> the proper functioning of the adversarial process,
> thereby, producing a result which cannot be relied on,
> that is, but for the deficient performance the outcome
> would be different. *Strickland v. Washington*, 466 U.S.
> 688 (1984); *Williamson v. Dugger*, 651 So.2d 84 (Fla.
> 1994); *Cabrera v. State*, 766 So. 2d 1131 (Fla. 2d DCA
> 2000). An attorney's performance must be reasonable
> under the prevailing professional norms, when considering
> all of the circumstances viewed from the attorney's
> perspective at the time of trial. *Cabrera* at 1133. There
> is a strong presumption of reasonableness which the
> defendant must overcome. *Id.*
>
> . . .
>
> 7. Defendant's second allegation claimed that trial
> counsel failed to call any alibi witnesses, and that if
> counsel would have called an alibi witness, they would
> have testified that Defendant was out of the area, in
> Ocala, Florida, at a family reunion, at the time of the
> robberies.
>
> 8. A sister, Layette, testified that Defendant rode
> with her and her two children to her grandmother's house
> in Ocala where she and Defendant, along with 50 other

family members, stayed all weekend for a family reunion. When asked by the State why she or any other family members didn't come forward until now, she claimed that she was waiting to be subpoenaed.

9. Trial counsel testified that Defendant was very hard to reach prior to trial because he had bonded out and would not return counsel's phone calls. Counsel further testified that the couple of times that he did speak to Defendant, and they discussed alibi witnesses, Defendant refused to give counsel any names and only stated that he would try to find the alibi witness. At no time did Defendant tell counsel that the alibi witness was a family member. Counsel also told Defendant that if he had a name, to give the name to counsel, because his office had investigators who could look for that person. Counsel further stated that at no time did Defendant give counsel the name of any witnesses.

10. After hearing all of the testimony, and weighing the credibility of all witnesses, the Court finds that Defendant's allegations are without merit.

Exh. D-7 at 2-3. Petitioner appealed the denial of his ineffective assistance claim. Exh. E-1. The appellate court affirmed without opinion. Exh. E-3; *Truesdale v. State*, 946 So. 2d 1075 (Fla. 2d DCA 2006).

In its April 15, 2005 order, the post-conviction court cited to and correctly identified the *Stickland* federal analysis as the governing standard in evaluating a claim that counsel was ineffective. Thus, Petitioner must demonstrate that the state court unreasonably applied the *Strickland* standard to the facts of Petitioner's case. In other words, in order to prevail on his claim for relief, Petitioner must demonstrate that the state court's decision was "objectively unreasonable," not just incorrect or erroneous. *Williams v. Taylor*, 529 U.S. at 413.

Here, the postconviction court found trial counsel's testimony more credible than Petitioner's testimony. "Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." *Consalvo v. Sec'y, Fla. Dep't of Corr.*, ___ F.3d ___, 2011 Wl 6141663 (11th Cir. Dec. 12, 2011). In fact, "[f]ederal habeas courts have 'no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.'" *Id.* (quoting *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). Instead, the federal courts consider "questions about the credibility and demeanor of a witness to be questions of fact." *Id.* (citations omitted). Because AEDPA affords a presumption of correctness to a factual determination made by a state court, Petitioner is required to overcome this presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e).

At the evidentiary hearing Lavette Truesdale, Petitioner's sister, testified on direct examination that she was aware that her brother was facing robbery charges in 2001, and stated that he had asked her "[a]bout two weeks before he went to court" if she would testify in his defense, and she agreed to do so. Exh. D-6 at 7-8. Ms. Truesdale stated that Petitioner and her 2 children were in Ocala from March 13 through March 17 for a family reunion at her grandmothers' house, where approximately fifty other people were present. *Id.* at 8-9. Ms. Truesdale admitted that she never

-29-

contacted Petitioner's attorney because she "didn't have his name."
*Id.* at 9. She testified that she never asked Petitioner "what his
name was" because Petitioner told her that she would be subpoenaed.
*Id.* She acknowledged that she did not receive a subpoena, and did
not come to trial the day of Petitioner's trial because she "had to
work." *Id.*

On cross-examination, Ms. Truesdale said she tried to call the
Lee County Sheriff's Office but "you cannot get through their phone
system," and only spoke to "the computer." *Id.* at 10. Ms.
Truesdale admitted that during the "six months to a year period of
time" before her brother went to trial she did not ever go to the
sheriff's office because she "was waiting for a subpoena." *Id.* at
10-11.

Petitioner testified that he was bonded out of jail for about
a year before his case went to trial. *Id.* at 14. During that
time, Petitioner did not work, and spoke to his attorney when the
attorney called him on the telephone. *Id.* at 15. When Petitioner
was asked why he had not asked for the rest of his family to be
alibi witnesses, he answered, "That I don't know. Well I got -- I
got my mother, she -- she would go, you know. Everybody else stay
up there, so I think it would be kind of hard for them to travel
down." *Id.* at 20. Petitioner testified that, before his case was
set for trial, he gave defense counsel his sister's name, address,
and phone number as an alibi witness. *Id.* at 22-23.

Petitioner's trial counsel, Michael Glenn Archibald, testified that Petitioner "moved around a lot" and the only phone number he had for him was the number of a relative with whom Petitioner had previously lived. *Id.* at 31. Mr. Archibald called the number weekly and was told by the woman who answered, "I'll give him the message," but he was able to speak with Petitioner "approximately twice, and that's after [his] many, many calls to him." *Id.* Mr. Archibald acknowledged that:

He told me when I first talked to him, that he did say that he had an alibi - - he had an alibi witness. And I told him, Mr. Truesdale, give me that person's name. He says no, I'm going to find her. I said no, no, no. You give me the name because we've got people here that can go find her. He said he'd call me back.

Q: Did he call you back?

A: No.

Q: Did you again have an opportunity to speak with him?

A: Again after many phone calls. And -- and I also remember writing Mr. Truesdale, too. Unfortunately I don't have the file. I left it at the P.D.'s Office when I left. But I wrote him many letters. Those letters specifically state, give me the name of this person. We're running out of time here. Mr. Truesdale, I hate to say it, but he was wholly uncooperative in assisting me in the defense of this case.

Q: Did he ever respond to any of those letters and give you the name of an alibi witness?

A: No, ma'am, he never once gave me the name of any witness that he was going to call, alibi or otherwise.

Q: You indicated you had a second phone conversation with him, . . . can you put that in a time frame in terms of trial. . . ?

A:   . . . I honestly cannot say when it was but it had
to be relatively close to the -- the upcoming docket,
because I remember I was pretty upset with him.  He had
not come in to see me. . . . So, in all honesty, I think
the worst thing that happened for Mr. Truesdale was the
fact that he was able to get out on bond, because he -  -
that allowed him to just be out there and to be in
denial. And he just would not assist me in the case.

The second phone call that I had with him, though,
I let him know that we're going.  Judge Corbin said this
is it; you're going to trial.  He needs to come in and
see me.  He would never come in. I asked him again about
this alibi person.  Again, he said -- well, this time he
said the person had moved; again, still no name, no name.

Q:   Did you speak with Mr. Truesdale the morning of
trial?

A:   Yes, Mr. Truesdale showed up the morning of trial.

Q:   And during your conversation with him the morning
before trial, did you talk about the defensive alibi?

A:   Yes. . . . Even then, he would not give me a name.
Even then, he would not give me an alibi witness name or
any other witnesses.

Q:   At any time during your representation of Mr.
Truesdale . . . up until the morning of trial.  Did you
ever hear from any member of Mr. Truesdale's family?

A:   No, I never heard from one.  However, I think I
talked to one. Again, the number that I had for Johnny
Truesdale was to a female's house, and some -  - for some
reason I want to think that that was his cousin.   And
she, at times, seemed to act as an intermediary between
me and Mr. Truesdale because I would tell this person,
listen, you need to tell Johnny to call me.  You need to
tell Johnny to get his butt up here so we can prepare for
his defense.

Q:   In talking to that female member that was answering
the phone at the number you had for Mr. Truesdale, did
she ever mention to you a name of an alibi witness?

A:   No, she acted very bothered.

Exh. D-6 at 31-35.

Petitioner contends that it was his trial counsel's duty to undertake an independent investigation to discover whether Petitioner had an alibi. Reply at 48-49. Specifically, Petitioner asserts that because counsel sent a subpoena for him to appear at trial to his family's home address, counsel knew their address and should have visited his family to inquire whether Petitioner had an alibi, even if Petitioner was being uncooperative. *Id.* at 49

"[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Williams v. Head,* 185 F.3d 1223, 1236 (11th Cir. 1999)(quoting *Strickland,* 466 U.S. at 691). "'[T]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.'" *Bertolotti v. Dugger,* 883 F.2d 1503, 1512(11th Cir. 1989)(quoting *Strickland,* 466 U.S. at 691)).

Here, Truesdale did not tell defense counsel where he presumably even was on the day of the robbery, yet alone who could vouch for his alibi. Counsel testified to telephoning Petitioner numerous times to no avail. Further, counsel asked Petitioner for the name of the potential witness and told Petitioner his office would locate the person, but Petitioner insisted that he would have the witness call counsel.

The Court recognizes that the "correct approach toward investigation reflects the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." *Williams v. Head*, 185 F.3d at 1237. Petitioner fails to explain, yet alone demonstrate how counsel could have located an alibi witness on his behalf when counsel was unaware of any of the particulars of Petitioner's claimed alibi. Consequently, Truesdale has not shown that the State court's rejection of this ineffectiveness claim provides any basis for relief, and the Court denies Ground 4 of the Petition as without merit.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1. The Petition for Writ of Habeas Corpus (Doc. #1) is **DENIED** for the reasons set forth herein.

2. The Clerk of the Court shall enter judgment accordingly; terminate any pending motions; and, close this file.

## CERTIFICATE OF APPEALABILITY AND
## LEAVE TO APPEAL *IN FORMA PAUPERIS* DENIED

**IT IS FURTHER ORDERED** that Petitioner is not entitled to a certificate of appealability. A prisoner seeking to appeal a district court's final order denying his petition for writ of habeas corpus has no absolute entitlement to appeal but must obtain a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1); *Harbison v. Bell*, 556 U.S. 180, 129 S. Ct. 1481, 1485 (2009). "A [COA] may issue . . . only if the applicant has made a substantial

showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) or, that "the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Petitioner has not made the requisite showing in these circumstances.

Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

DONE AND ORDERED in Orlando, Florida, on this ___7___ day of ~~January~~, 2012.

*Feb*

G. KENDALL SHARP
SENIOR UNITED STATES DISTRICT JUDGE

SA: hmk
Copies: All Parties of Record

-35-